Filed 2/18/16  In re E.S. CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| In re E.S. et al., Persons Coming Under the Juvenile Court Law. | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES, | E063123 |
| Plaintiff and Respondent, | (Super.Ct.No. INJ012156) |
| v. | OPINION |
| M.S., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Susanne S. Cho, Judge.

Affirmed.

Brent Riggs, under appointment by the Court of Appeal, for Defendant and

Appellant.

Gregory P. Priamos, County Counsel, and James E. Brown, Guy B. Pittman, and

Julie Koons Jarvi, Deputy County Counsel, for Plaintiff and Respondent.

1

Defendant and appellant M.S. (father) appeals from the juvenile court's disposition order under Welfare and Institutions Code[1] section 361, subdivision (c)(1) removing his seven children (Et.S. (age 15); Z.S.1 (age 13); Z.S.2 (age 10); H.S. (age 8); El.S. (age 6); R.S. (age 5); and Mi.S. (age 2)), from his custody after declaring them to be dependents of the court. He contends the evidence is insufficient to show that removal was the only means of protecting the children. We affirm.

## I. PROCEDURAL BACKGROUND AND FACTS

On January 14, 2015, the Department of Public Social Services (Department) received an immediate response referral with allegations of general neglect. The social worker met with law enforcement, who indicated that mother and father were arrested for "willful harm to a child/child endangerment." Law enforcement had responded to a call reporting incidents of domestic violence at the parents' home. The parents were told to stop fighting, and it was suggested that one parent leave the residence for a "cooling off" period. According to law enforcement, the home was unsafe for the children because within their reach were a firearm, paint thinner, power cords, power tools, nails, pieces of wood, and other miscellaneous items.

The parents are the biological parents of all seven children. In 2000, father took mother and his children "to the top of a dirt road to live," saying that he was "'called to preach'" and that "'God [would] provide animals by the twos[] for them to live." About

<hr />

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

the first week in January 2015, father began renovating the family home. He started believing that mother had been unfaithful, someone was trying to kill him, and there were threatening writings throughout the home. Searching for the writings, he took things apart and examined the walls with a magnifying glass.

According to mother, father's behavior had changed within the last four to five weeks. While he had always been controlling and jealous, he was now accusing her of being unfaithful and plotting to murder him. He would look for clues "on rocks, see writing on the walls, and find messages on napkins about the mother having an affair or someone was coming 'home to get him.'" Despite mother's concern that father was not "'mentally right,'" he did not seek help, and the parents decided to separate peacefully. Father started removing the doors in the home and gathering items such as "clothes, plastics, rocks, [and] 'dog poop'" to put in a room to be used as evidence against mother. He accused mother of being a "'devil worshiper.'"

Mother reported there was a loaded gun in the home, which father had started to carry for protection. She indicated that father allowed Z.S.1 to handle the loaded gun. On the night of January 13, 2015, while father slept on a mattress in the kitchen, mother took the gun (loaded and unlocked) from next to him and hid it because he had threatened to kill her, the children, and himself. On January 10, 2015, father took mother to the desert, pointed the gun at her head, and threatened to kill her. On January 14, mother went to the police station and obtained paperwork for a restraining order against father. When she returned, father would not let her leave the house or use the phone. Mother

gave Et.S. permission to contact law enforcement if the situation escalated. Mother eventually broke the front window to get out, but father chased her in his car.

Et.S., Z.S.1, Z.S.2, El.S., and H.S. were interviewed. Z.S.1 confirmed mother's observations of father, admitting that he (Z.S.1) was afraid of what father "could do to his family," and that he (Z.S.1) did not feel safe in his home due to father's behavior. Fearing that his parents might shoot him or someone else, Z.S.1 would take the gun into his room. El.S. was also afraid of father; however, he felt safe at home because mother was there. Et.S. indicated she felt safe in her home but was concerned about father's behavior and was scared by his threats to kill the family. She thought that father should be in a mental facility. She stated that father's behaviors had been occurring for several years but usually only lasted a day or two; however, for the last month, he had become extremely paranoid. She confirmed that father believed someone was trying to kill him and that he had altered the house for protection. Prior to father's renovation of the house, it had been clean. Et.S. knew that mother had tried to get away from father for years. In her interview, Z.S.2 said she did not feel safe with father. Although she witnessed her parents engage in verbal fights, she never saw any physical violence between them. Z.S.2 confirmed that father threatened to kill mother with the gun, and that he had removed all of the doors from their hinges because he believed someone named "Fred" was out to harm the family.

The social worker interviewed father. Father admitted that he and mother had recently decided to separate. He claimed that on January 14, 2015, he went to the police

4

station to report that mother had taken his gun, threatened to use it to kill him, and refused to return it. He claimed that, because several people were "'out to get'" him, he had to take precautions and outfit the house so that he would be able to hear anyone attempting to get in. He admitted having Z.S.1 possess the gun to protect the family when he (father) was not there. According to father, the house was in poor condition because of his renovations.

On January 15, 2015, mother called the social worker and left a message stating she was back with father and they were trying to work things out. She requested information on what she needed to complete to have her children returned to her care.

On January 16, 2015, the Department petitioned the juvenile court to exercise jurisdiction under section 300, subdivision (b). The petition alleged that each child had either suffered or was at a substantial risk of suffering serious physical harm or illness resulting from (1) a parent's failure or inability to adequately supervise or protect the child, or (2) a parent's inability to provide regular care because of the parents' mental illness, developmental disability, or substance abuse.

On January 20, 2015, the juvenile court found that a prima facie showing had been made that the children came within section 300, subdivision (b) and detained them. The children were placed outside the home, services were ordered for both parents, and a jurisdictional hearing was set.

The jurisdiction/disposition report was filed on February 5, 2015. The Department recommended that reunification services be provided to both parents and that the children

be detained outside the home.  On January 28, 2015, a social worker interviewed mother concerning the allegations in the petition.  Mother claimed that she had previously lied, because she thought she was in a custody battle with father and was "'trying to win'" the children.  She denied that the children had access to the gun.  She claimed their "biggest downfall" was involving the children in their personal dispute.  She denied that father ever threatened her, claiming that she was trying to turn the children against him.  She accused Z.S.1 of playing a practical joke on father by feeding father's belief that someone was after him.  Regarding the restraining order against father, mother claimed that she wanted to obtain one in order to prevent father from selling the house and moving to Belize.  Mother denied that either she or father used drugs.

On January 28, 2015, a social worker interviewed father.  Father claimed the gun was always locked up in a safe place; that mother and he engaged in a verbal argument when the children were at school; his work tools and items were in plain sight because he had not yet been able to put them away after returning from a job; and that the dog broke the window.  Father denied suffering from a history of bizarre or erratic behavior, denied feeling that others were plotting against him, and denied making threats to harm mother.  However, he admitted saying things to "'play the children against'" mother, such as calling her evil or Satan.  He denied that he had threatened his children and denied there was any domestic violence in the home or that he believed mother was unfaithful to him.  Father admitted using drugs in his 20's but claimed to be clean since then.  A drug test on January 19, 2015, confirmed that father did not have any controlled substances in his

system. The social worker opined that both parents had minimized the domestic violence between them and both had made minimal progress in mitigating the circumstances which had brought the family to the attention of the Department.

On February 10, 2015, the juvenile court ordered Et.S. "placed on a special visit with mother upon the condition and verification that father move out of the home and that the home is suitable." The court further authorized placement of all of the children with mother upon verification that the father moved out of the home.

An addendum report for the jurisdiction/disposition hearing was filed on March 9, 2015. The Department continued to recommend services for both parents and further recommended that Et.S. be placed in mother's care. On February 17, 2015, the social worker made an unannounced visit to mother's home. Mother reported that father moved his clothing and belongings to their recreational vehicle, which was parked at the maternal grandmother's home. The home was clean and all utilities were working. The social worker was concerned about mother's frequent contact with father and her refusal to seek a restraining order against him. The parents failed to understand how the incident of domestic violence affected the children and their well-being.

A contested jurisdiction hearing was held on March 12, 2015. The juvenile court sustained the allegations in the petition with the exception of b-6 and b-7, which the court struck. The allegations found to be true asserted that parents neglected the safety and well-being of the children in that they engaged in acts of domestic violence involving a loaded firearm and resulted in the parents being arrested; parents demonstrated a limited

7

ability to protect the children in that they had access to a loaded firearm and they were found living in unsafe home conditions; father had a history of demonstrating erratic and irrational behavior and continued to maintain a loaded firearm in the home within access of the children; and father had a history of abusing controlled substances, not limited to marijuana. Finding that the children came within section 300, subdivision (b), the juvenile court adjudicated them to be dependents of the court. Mother was provided with family maintenance services as to the four oldest children. Et.S., R.S., and Mi.S. were removed from mother's care, and mother was provided reunifications services as to them. All seven children were removed from father's care, and he was provided with reunification services. The court ordered liberalized visitation, from supervised to unsupervised, incrementally moving to overnight and weekends. The court also ordered a psychological evaluation for father, and that the Department provide the doctor with all reports, including the police reports.

## II.  SUBSTANTIAL EVIDENCE SUPPORTS THE JUVENILE COURT'S DECISION TO REMOVE THE CHILDREN FROM PARENTAL CUSTODY

Father contends the evidence is insufficient to show there were no other reasonable means of protecting the children without removing them from his care. We reject his contention.

When a minor has been adjudged a dependent child of the court on the ground that he or she is a person described by section 300, the court may limit the control to be exercised over the dependent child by the parent or guardian. (§ 361, subd. (a).) A

8

dependent child may not be taken from the physical custody of his or her parents or guardians unless the juvenile court finds, by clear and convincing evidence, certain circumstances. (§ 361, subd. (c).) A finding that there is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor, is one of the circumstances that justifies removal. (§ 361, subd. (c)(1).)

Some jurisdictional findings are prima facie evidence that the child cannot remain safely in the home. (§§ 300, subd. (e), 361, subd. (c)(1); *In re T.V.* (2013) 217 Cal.App.4th 126, 135 ["Exposing children to recurring domestic violence may be sufficient to establish jurisdiction under section 300, subdivision (b)."].) "The parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate. The focus of the statute is on averting harm to the child." (*Id.* at pp. 135-136.) To support a removal order, the court may consider the parents' past conduct as well as present circumstances. (*In re Cole C.* (2009) 174 Cal.App.4th 900, 917.) A removal order is proper if based on proof of parental inability to provide proper care for the child and proof of a potential detriment to the child if he or she remains with the parent. (*In re N.M.* (2011) 197 Cal.App.4th 159, 169.)

When reviewing a challenge to the sufficiency of the evidence supporting a juvenile court's jurisdictional findings, "'we determine if substantial evidence, contradicted or uncontradicted, supports them.' . . ." (*In re I.J.* (2013) 56 Cal.4th 766,

9

773.)  We consider the record as a whole, resolving all conflicts and drawing all reasonable inferences in support of the jurisdictional findings.  (*In re Lana S.* (2012) 207 Cal.App.4th 94, 103.)  "'We do not reweigh the evidence, evaluate the credibility of witnesses or resolve evidentiary conflicts.'"  (*Ibid.*)  The testimony of a single witness can support jurisdiction.  (*In re Sheila B.* (1993) 19 Cal.App.4th 187, 200.)  Thus, in order to succeed on appeal, father must demonstrate that there is no evidence of a sufficiently substantial nature to support the juvenile court's jurisdictional findings.  (*In re Lana S.*, *supra*, at p. 103.)

Here, the same evidence that supported jurisdiction also supported removal of custody from father.  According to the record, the family came to the attention of the Department because father threatened to kill mother, the children, and himself, due to his belief that mother was being unfaithful to him and that someone was plotting to kill him. Father carried a loaded gun around the home, tore apart walls, took doors off their hinges, and exhibited paranoid behavior.  Given the circumstances presented, the juvenile court considered removal of the offending parent, father, from the home as a reasonable means of protecting the children, as well as, placing the four older children with the mother while placing the three younger children in foster care.  The court expressed its concern that the return of all the children to mother's care would be overwhelming in the absence of another parent's presence.  Et.S. expressed concern that she would be made to be the babysitter for all the children while mother was attending various classes to complete her case plan.  More importantly, the court noted that the older children are able to "respond

10

to any danger as to situations that they observe, whereas the younger children are not as capable." Thus, the court reasonably ordered father removed from the family home, allowed the four older children to remain with mother, and placed the three younger children in foster care pending approval of a relative placement with a goal of reuniting the family.[2]

Given the above, we conclude there was substantial evidence to order the children removed from father's custody.

### III. DISPOSTION

The disposition order is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

HOLLENHORST<br>
Acting P. J.

We concur:

MCKINSTER<br>
J.

CODRINGTON<br>
J.

---

[2] Father argues that "[i]n finding no other *reasonable means*, the juvenile court seemed most concerned that the government may not have provided the police report to the mental-health professional who had examined the father on the government's behalf and had then pronounced the father possessed of good judgment and insight and lacking in any homicidal intent or history of mental illness." In considering father's mental health assessment, the juvenile court did note that the doctor only interviewed father without the benefit of the police report or further background information. Thus, the trial court wanted "an immediate referral to a court-appointed psychologist to do an evaluation of the father" and wanted the Department to send "the reports as well as the police reports in this case" to the doctor. The evaluation of father was necessary for the purposes of creating an appropriate case plan.